ALTSHULER BERZON LLP
EVE H. CERVANTEZ (164709)
ecervantez@altber.com
117 Post Street, Suite 300
San Francisco, CA  94108
Telephone (415) 421-7151
Facsimile: (415) 362-8064

*Counsel for Plaintiffs*

(Additional Counsel for Plaintiffs Appear on Signature Page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANNIE CHANG, TIGER CHANG INVESTMENTS, LLC, ASIANS INVESTING IN REAL ESTATE, LLC, MELANIE GONZALES, GARY GONZALES, and G&M YOU-NIQUE PROPERTY LLC, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. 3:19-cv-01973 **CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................... 1

II.    PARTIES ....................................................................................................... 4

     A.  Plaintiffs ............................................................................................. 4

     B.  Defendant ............................................................................................ 5

III.   RELEVANT NON-PARTIES ........................................................................ 5

IV.  JURISDICTION & VENUE .......................................................................... 6

V.    INTRADISTRICT ASSIGNMENT ............................................................... 7

VI.  SUBSTANTIVE ALLEGATIONS ............................................................... 7

     A.  Background on the Equitybuild Scheme.............................................. 8

         1.  Equitybuild Raised Money from Investors Through Fraudulent
             Promissory Note Sales ........................................................... 8

         2.  Equitybuild Raised Money from Investors Through Fraudulent
             Real Estate Fund Offerings .................................................. 11

         3.  The SEC Charged Equitybuild and the Cohens for Fraud and the
             Court Appointed a Receiver ................................................. 12

     B.  Wells Fargo's Role and Participation in the Equitybuild Scheme ............................... 13

         1.  Regulatory Framework Applicable to Wells Fargo's Relationship
             with Equitybuild and Its Investors ...................................... 14

         2.  Wells Fargo Knew That It Received Investor Funds into
             Equitybuild's Accounts and That Money from Those Accounts
             Was Sent to Investors as Interest Payments, in Ponzi Fashion ............................ 19

             (a)  The Wells Fargo Wire Instruction Forms.......................... 21

             (b) The Wells Fargo Direct Deposit Authorization Forms ..................... 22

             (c)  Real Estate Investment Fund Accounts Held by Wells Fargo ..................... 27

         3.  Wells Fargo Knew Equitybuild Frequently Bounced Checks.............................. 27

         4.  Wells Fargo Knew That Equitybuild Was Financing Interest
             Payments to Investors with Other Investors' Money, Rather Than
             with Income Generated by the Investment Programs............................. 27

VII.  CLASS ACTION ALLEGATIONS ............................................................. 29

VIII. CAUSES OF ACTION.................................................................................. 31

     COUNT I Aiding and Abetting Fraud ........................................................ 31

COUNT II Aiding and Abetting Breach of Fiduciary Duty ...................................................... 35

COUNT III Negligence ........................................................................................................... 40

IX.    PRAYER FOR RELIEF ..................................................................................................... 42

DEMAND FOR JURY TRIAL .................................................................................................. 45

Plaintiffs, Annie Chang, Tiger Chang Investments, LLC, Asians Investing in Real Estate, LLC, Melanie Gonzales, Gary Gonzales, and G&M You-Nique Property LLC (together, "Plaintiffs"), by their undersigned attorneys, hereby bring this class action Complaint (the "Complaint") against Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts, respectively, and on information and belief as to all other matters, except for the allegations sounding in fraud, such information and belief having been informed by the investigation conducted by and under the supervision of Plaintiffs' counsel, which includes, without limitation: (a) review and analysis of regulatory filings made by Equitybuild, Inc. and Equitybuild Finance, LLC with the United States Securities and Exchange Commission ("SEC"); (b) the proceedings brought by the SEC starting on or about August 15, 2018, against certain individuals and companies in connection with the Equitybuild Ponzi scheme in the case of *SEC v. Equitybuild, Inc., et al.*, No. 1:18-cv-05587 (N.D. Ill. Aug. 15, 2018) (the "SEC Action"); (c) interviews with Equitybuild investors and former employees; and (d) review of various public records associated with Equitybuild, its control persons, and its properties. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendant. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows.

## I.   INTRODUCTION

1.   Plaintiffs and other members of the class are victims of a Ponzi scheme perpetrated with Defendant Wells Fargo's knowing assistance and through its gross negligence, and in violation of its fiduciary duties, as trustee, custodian, and/or escrow agent of Plaintiffs' and similarly situated investors' money.

2.   The scheme was the brainchild of Jerome Cohen and his son, Shaun Cohen, who, through the companies they together controlled (referred to herein collectively as "Equitybuild"), raised money from investors ostensibly to invest in a real estate investment program that the

Cohens managed and that purchased, renovated, and developed income-producing real estate properties in Chicago.

3.      To solicit investors, the Cohens touted their supposed successful track record and mastery of real estate investing, luring investors with the promise of double-digit returns on low-risk investments, secured by income-producing real estate properties. Investors were peddled tales of the Cohens' prior success on more than 700 real estate transactions and their supposed ability to bring the benefits of real estate investing to "regular people." This salesmanship worked: the Cohens, through Equitybuild, raised at least $135 million from more than 900 investors nationwide, including Plaintiffs.

4.      In reality, however, Equitybuild's real estate investment program was a sham. The Cohens raised money from investors through misrepresentations and omissions, siphoned much of it, improperly commingled it, used it for Ponzi payments to other investors, and skimmed between 15% and 30% off each investment by taking undisclosed fees. The Cohens told investors that the properties being purchased cost substantially more than what the Cohens actually paid for them. Not only did these properties cost less than investors were told, but the properties also failed to generate the income that the Cohens promised, and instead incurred heavy losses. The investment programs did not generate enough income to finance the promised interest payments. In reality, Equitybuild was a Ponzi scheme: the Cohens could only pay earlier investors by raising funds from new investors (the "Equitybuild Scheme").

5.      The Cohens did not perpetrate the Equitybuild Scheme alone. Instead, the scheme depended on the knowing participation of Wells Fargo, the bank through which investor funds were wired, commingled, and disbursed.

6.      Documents from Equitybuild and Wells Fargo demonstrate that Wells Fargo knew that (1) the money it was receiving in the Equitybuild accounts came from investors, who believed they were investing in a real estate investment program managed by the Cohens—Equitybuild—which in turn invested the investors' money in various real estate projects; (2) this money was fiduciary money; and (3) money from these same accounts was being improperly commingled and disbursed to investors as supposed "interest" on their investments in Ponzi fashion. Indeed, Wells

Fargo used actively modified Direct Deposit Authorization Forms (as defined herein) provided to Equitybuild's investors so that these forms reflected that the money being disbursed was interest on investors' investments.

7.      Thus, Wells Fargo was willing to deviate from its standard course of business to accommodate Equitybuild. As a former Equitybuild employee explained, Equitybuild's contact at Wells Fargo "seemed like she was willing to do pretty much anything" for the perpetrators of the fraud.

8.      As stated above, on August 15, 2018, the SEC filed a complaint against the Cohens and Equitybuild in the Northern District of Illinois, alleging that the Cohens were operating a Ponzi scheme, and simultaneously moved to enjoin the fraud and have a Receiver appointed—a motion the Court granted.

9.      Records in the SEC Action, which is ongoing, show that Equitybuild was improperly commingling funds across its various investment programs and paying earlier investors with funds raised from new, unwitting investors in Ponzi fashion. The SEC also alleges, based on a review of Equitybuild's bank records, that Equitybuild had received far less money from property managers into the Equitybuild accounts than what investors were paid in "interest" out of those same accounts. For example, between January 2015 and February 2017, Equitybuild received $3.8 million into its accounts as income from purported real estate investments, and yet Equitybuild paid investors approximately $14.5 million in interest payments over this same period.

10.      Thus, through a review of Wells Fargo bank records alone, it is clear that Equitybuild was improperly commingling and misusing fiduciary funds deposited by investors, in clear breach of the Cohens' fiduciary duties to investors, and was operating a Ponzi scheme through Wells Fargo's accounts and with its assistance, by financing the interest payments owed to other investors with new investors' money, rather than with the income from real estate properties that was supposed to support those returns.

11.      Moreover, according to a former Equitybuild employee, Equitybuild frequently bounced checks due to depleted funds in the Equitybuild accounts. The bounced checks were for thousands of dollars, and in some cases they were in the $20,000-$30,000 range.

12.     As more fully described below, Wells Fargo had actual knowledge that it held fiduciary funds in its accounts (i.e., it observed investor money coming in and knew the nature of the investments) and knew that those funds were actively being misused (i.e., it knew that investor funds were being commingled, misused, and sent to other investors as supposed "interest payments," despite that the income coming in from the investment programs was far less than what was disbursed to investors as interest).

13.     Plaintiffs now bring this action to recover from Wells Fargo the damages sustained as a result of the bank's wrongdoing and substantial assistance in the Equitybuild Scheme.

## II.   PARTIES

### A.   Plaintiffs

14.     Plaintiff Annie Chang is a resident of Orange, California. Ms. Chang made several investments in Equitybuild, for a total of $341,579, between May 13, 2016 and June 29, 2017. Ms. Chang wired her investments to Equitybuild's Wells Fargo bank accounts, including account numbers ****992, ****649, and ****282. Ms. Chang learned about the loss of her investments when the SEC charged Equitybuild and its principals with fraud.

15.     Plaintiffs Tiger Chang Investments, LLC ("TCI") and Asians Investing in Real Estate, LLC ("AIRE") are two family investment vehicles constituted in California, with their principal place of business in Los Angeles, California. Both entities are managed by Chuchun "Ann" Liu, a resident of Orange, California. These entities' owners are Ann and her husband, Hsiao-Shih "Oliver" Chang. AIRE and TCI made several investments in Equitybuild, of $1,693,402 and $54,000 respectively, for a total of $1,747,402, between March 4, 2015 and March 8, 2018. Both entities wired their investments to Equitybuild's Wells Fargo bank accounts, including account numbers ****110, ****992, ****251, ****282, ****203, ****116, and ****498. AIRE and TCI, through their manager, Ann Liu, learned of the loss of their investments when the SEC unveiled securities fraud charges against Equitybuild and its principals.

16.     Plaintiffs Melanie and Gary Gonzales are residents of Metairie, Louisiana. Plaintiff G&M You-Nique Property LLC ("G&M") is their family investment vehicle, which they own and

CLASS ACTION COMPLAINT

control. G&M is constituted in Louisiana and its principal place of business is in Metairie, Louisiana. Melanie and Gary Gonzales, and G&M, made four investments in Equitybuild, for a total of $565,000, between October 6, 2015 and March 21, 2017. They wired their investments to Equitybuild's Wells Fargo bank accounts, including account number ****992. They learned about the loss in their investments when the SEC unveiled securities fraud charges against Equitybuild and its principals.

**B.    Defendant**

17.    Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a financial services company headquartered in San Francisco, California. Wells Fargo is the third largest bank in the United States as measured by assets.

18.    Wells Fargo is a serial violator of the compliance and supervisory rules applicable to banks and has been the subject of many regulatory actions for numerous compliance violations, many of them reported in the media. In April 2018, bank regulators fined Wells Fargo for various supervisory and compliance violations. The severity of the violations is reflected by the amount of the fine: $1 billion.

19.    As more fully detailed below, Wells Fargo served as a custodian for the fiduciary funds deposited by Plaintiffs and each investor in Equitybuild, and helped and enabled Equitybuild to commingle and misuse investor money and perpetrate a Ponzi scheme. Wells Fargo also served as an escrow agent for some of the Equitybuild programs. Wells Fargo received substantial fees, paid with the Equitybuild investors' money, for its services and went out of its way to assist Equitybuild's organizers perpetrate their scheme.

## III.    RELEVANT NON-PARTIES

20.    Equitybuild, Inc. is a Florida corporation, with an office in Chicago. Since at least 2010, Equitybuild, Inc. has solicited investors by promising them returns ostensibly generated by investments in a real estate investment program that purchased, renovated, and developed real estate in Chicago.

CLASS ACTION COMPLAINT

21.     Equitybuild Finance, LLC ("Equitybuild Finance" and, together with Equitybuild, Inc., "Equitybuild") is a Delaware limited liability company. Since at least 2010, Equitybuild Finance has solicited investors by promising them returns ostensibly generated by investments in a real estate investment program that purchased, renovated, and developed real estate in Chicago.

22.     Jerome H. Cohen is a resident of Florida. Jerome H. Cohen founded Equitybuild, Inc. and Equitybuild Finance. He is the CEO and president of Equitybuild, Inc., who, along with his son, Shaun, controlled Equitybuild.

23.     Shaun D. Cohen is a resident of New York. He is the President and sole officer of Equitybuild Finance and the Vice President of Equitybuild, Inc., who, along with this father, Jerome, controlled Equitybuild.

24.     Equitybuild, Inc., Equitybuild Finance, Jerome Cohen, and Shaun Cohen are referred to herein as the "Equitybuild Scheme Perpetrators."

25.     None of the Equitybuild Scheme Perpetrators could be named as a defendant in this case because of the court's injunction against civil lawsuits against them, entered in the SEC Action.

## IV.    JURISDICTION & VENUE

26.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), as this action is brought as a class action on behalf of hundreds of class members, one or more members of the class are citizens of a different state than the Defendant, and the aggregate amount in controversy exceeds $5,000,000.

27.     The Court has personal jurisdiction over Wells Fargo because its principal place of business and headquarters are in San Francisco, California, regularly transacts business in California, and thus has minimum contacts in California, and in this District.

28.     Venue is proper under 28 U.S.C. § 1391 because Defendant resides in this District. Venue is also proper because Defendant has offices, transacts, and has transacted business in this District at times material to this action.

**V.     INTRADISTRICT ASSIGNMENT**

29.     Pursuant to Norther District of California Civil Local Rules 3-2(c) and 3-2(d), assignment to the San Francisco division is appropriate because a substantial part of the events which give rise to the claims occurred at Wells Fargo headquarters in San Francisco.

**VI.     SUBSTANTIVE ALLEGATIONS**

30.     Defendant Wells Fargo violated its escrow/trustee/custodian agent duties to safeguard the fiduciary money that Plaintiffs and class members invested with Equitybuild in Wells Fargo's operating/escrow/trust accounts. Also, Wells Fargo knowingly assisted in Ponzi payments and the perpetration of fraud and breach of fiduciary duty on Plaintiffs and the Class, and allowed investors' money to be misused and misappropriated with knowledge and through its own gross negligence.

31.     As detailed below, Wells Fargo was aware that fiduciary, investor money was being deposited in its operating/escrow/trust accounts; was aware that investor money was being commingled and siphoned; was aware that new investor funds deposited in such accounts were being used to make "interest payments" to existing investors, in typical and obvious Ponzi scheme fashion; and was aware that the income deposited into the Equitybuild accounts from the underlying real estate properties was far less than the amount of money being disbursed to investors as "interest payments"—clear evidence that investor funds were being used to finance the interest payments owed to investors in Ponzi fashion.

32.     Moreover, Wells Fargo deviated from its standard course of business by modifying and/or accepting and using modified direct deposit authorization forms, to facilitate Equitybuild's supposed "interest payments" to investors, demonstrating Wells Fargo's substantial assistance and its knowledge that Equitybuild's Wells Fargo accounts held investor money that was being used to also pay investors. *See* Exhibits 1 & 5, attached hereto (the "Direct Deposit Authorization Forms").

A. **Background on the Equitybuild Scheme**

33. To understand Wells Fargo's role in the Equitybuild Scheme, it is important to first understand how the Equitybuild Scheme Perpetrator carried out the Ponzi scheme.

34. Since 2010, the Cohens, through Equitybuild's real estate investment program, raised at least $135 million with Wells Fargo's crucial assistance, by selling unregistered and non-exempt securities to more than 900 investors, promising to pool investor funds to purchase, renovate, or develop income-producing real estate properties, primarily in underdeveloped areas in Chicago.

35. The Cohens (through Equitybuild) raised funds from investors through two main mechanisms: (1) by offering and selling promissory notes; and (2) by offering investments in real estate pooled "funds" (with names like "Chicago Capital Fund" and "South Side Development Fund").

36. As detailed herein, for each of Equitybuild's investment programs (and whether solicited through the promissory notes or the real estate funds), investors wired money to Equitybuild's Wells Fargo accounts. Purported "interest payments" (i.e., returns on the real estate investments) were then sent from Equitybuild's Wells Fargo accounts to each investor's bank account(s). Wells Fargo was aware that investor, fiduciary money was deposited into its operating/escrow/trust accounts and that this same money was being commingled, misused, and sent back to earlier investors in the Equitybuild investment programs in Ponzi fashion. Wells Fargo also knew that the real estate properties were generating substantially less income than was being sent out as "interest payments" to investors—further evidence that Ponzi payments were used instead.

1. **Equitybuild Raised Money from Investors Through Fraudulent Promissory Note Sales**

37. Between approximately 2010 and 2017, the Equitybuild Scheme Perpetrators offered and sold fraudulent promissory notes (the "Notes") to Plaintiffs and the class. The parties to the Notes were: (a) the "borrower," which was typically Equitybuild, and (b) "lenders," who were the investors (i.e., Plaintiffs and the class).

38.     The Notes offered by Equitybuild were purportedly private mortgages. The Equitybuild Scheme Perpetrators raised money to invest it either to ostensibly: (a) fund the purchase of certain real estate properties that Equitybuild would redevelop; or (b) lend those funds to third-party purchasers, who would purchase certain real estate properties. In return for their investments into Equitybuild, investors received "interest" payments—in reality, Ponzi payments with their own or other investors' money—which ranged from 12% to 20%.

39.     Also, the supposed private mortgages were never recorded and the same property interests were sold and resold numerous times, to multiple investors.

40.     With respect to Equitybuild's redevelopment of properties, the Equitybuild Scheme Perpetrators represented to investors that it would use their money to purchase, rehabilitate, and "stabilize" (i.e., bring the property's revenues and expenses to market levels) certain real estate properties. Equitybuild's compensation was supposedly the difference between the rental income earned on the properties and the interest payments owed to investors.

41.     The Equitybuild Scheme Perpetrators also represented that Equitybuild lent investor-raised funds to third-party purchasers, who would use the investor-funded mortgage loans to purchase the properties securing the Notes. The Equitybuild Scheme Perpetrators represented that these third-party purchasers borrowed on shorter terms and at higher rates than purchasers using traditional mortgages (which implied that the interest payments from the third-party purchasers were sufficient to fund the interest payments owed to investors). As for its compensation, Equitybuild Scheme Perpetrators claimed that Equitybuild would retain as profits the difference between the mortgage payments received from the third-party purchasers and the interest payments made to the Note investors.

42.     In soliciting investors for the Notes, the Equitybuild Scheme Perpetrators issued and distributed to investors offering materials referred to as "white papers."

43.     The white papers described the Notes as "low risk" investments and claimed that "Equitybuild is ushering in a new era by making real estate investing more secure and reliable than ever."[1] The white papers also represented that Equitybuild was able to reduce the risk of investing

---

[1] See Exhibit 4 (Sample White Paper, Exhibit 3 to SEC Complaint).

in real estate because it could "calculate and predict a given property's future Net Operating Income"—i.e., ("NOI")—"with great precision."[2] A property's NOI—which is the unlevered cash flow real estate investors receive on income-producing properties (after deducting operating expenses)—is a fundamental metric used to calculate the income-generation potential of a property. The white papers even promised that Equitybuild would compensate investors "for any deficiency between the represented net operating income and the actual net operating income."[3]

44.     The Equitybuild Scheme Perpetrators therefore represented to investors that they possessed a unique skill and expertise.

45.     The white papers also touted Equitybuild's supposedly successful track record. For instance, the white papers claimed that Equitybuild developed a "unique, operational mastery of real estate investing" which produced "more than 700 successful real estate transactions."[4] Investors were also told that "[b]y reducing the risk [ ] investors face, [Equitybuild is] able to bring the exceptional benefits of real estate investing to regular people."[5]

46.     The Equitybuild Scheme Perpetrators therefore held themselves out as experts capable of making those investments accessible to average investors. Investors were led to believe that the Equitybuild Scheme Perpetrators would use their superior knowledge and expertise in their target real estate market to successfully manage the real estate investments.

47.     The white papers also promised that investors would receive profitable returns, touting, for instance, the purportedly "impressive double-digit returns that roll in month after month, regular as clockwork, but require absolutely no ongoing effort on [the investor's] part."[6]

48.     All the Notes were substantially similar and the relevant representations made to investors and summarized herein were similar in all material respects. The terms of the Notes

---

[2]     *Id.* at 5.
[3]     *Id.* at 7
[4]     *Id.* at 6.
[5]     *Id.*
[6]     *Id.* at 4.

CLASS ACTION COMPLAINT

ranged from six to 24 months. Investors were also offered the option, at the end of the Notes' terms, to roll over the principal into new Notes. Many investors exercised this option.

49.     Per the terms of the Notes, the investors assigned to Equitybuild Finance, as the "Collateral Agent," all of their rights and powers under the Notes and mortgages. This meant that the mortgages were entered between (a) Equitybuild, Inc., an affiliate entity, or, in some cases, a third-party purchaser, and (b) the investors, "care of" Equitybuild Finance.

50.     Jerome Cohen signed the Notes and mortgages on behalf of Equitybuild, Inc., or its affiliates. Shaun Cohen signed the Notes on behalf of Equitybuild Finance (having been delegated that authority by the investors).

51.     The Notes purported to comply with the laws of the State of Illinois.

52.     The Notes and related solicitation materials never disclosed that investors' money (1) would be commingled with money invested by other investors in the Notes; (2) would be misused and misappropriated by the Cohens; and (3) would be used to fund and operate a Ponzi scheme.

53.     The Notes were unregistered securities and did not qualify for any exemption from registration under the federal securities laws and regulations.

### 2.     Equitybuild Raised Money from Investors Through Fraudulent Real Estate Fund Offerings

54.     In 2017, the Cohens started to also offer unregistered and non-exempt investments in fraudulent pooled real estate investment vehicles, or funds (the "Real Estate Funds")—LLCs that had names like "Chicago Capital Fund" and "South Side Development Fund."

55.     Investors were told by the Equitybuild Scheme Perpetrators and their agents that the Real Estate Funds would pool investor proceeds to purchase and renovate real estate, primarily on the South Side of Chicago. Investors were promised strong returns, including one fund offering 15% returns for 24 months, and another offering 14% returns in as short as six months. One Real Estate Fund promised "guaranteed" returns.

56.     It is clear from the names of these entities that these investment programs were investment funds. Moreover, in an effort to provide legitimacy to the scheme, Equitybuild

explained in each Real Estate Funds' offering material that the applicable fund had "established an Investment Holding Account with Wells Fargo Bank," into which offering proceeds would be placed.[7]

\*        \*        \*

57.     The offering materials for the Notes and the Real Estate Funds never disclosed to investors that (a) Equitybuild used significant portions of investor money to repay earlier Note investors in Ponzi fashion; (b) many of the properties purchased with the investors' funds were the same properties that purportedly secured prior investors' Notes; (c) the Equitybuild Scheme Perpetrators were "skimming"—or stealing—substantial amounts of the investors' investments in undisclosed fees, as soon as their money was deposited in the Wells Fargo accounts; (d) many of the properties advertised as investment opportunities cost substantially less, in reality, than the investors were told, and the Cohens kept the difference; (e) investor money for various real estate investment programs organized, overseen, and managed by Equitybuild was improperly commingled; (f) investor money was being misused and misappropriated by the Cohens; and (g) the properties Equitybuild was to acquire with investor money were actually previously acquired in the course of the earlier Equitybuild offerings and supposedly secured the prior investments. Investors in the Equitybuild offerings were also not told that Equitybuild would be unable to pay earlier investors.

### 3.     The SEC Charged Equitybuild and the Cohens for Fraud and the Court Appointed a Receiver

58.     On August 15, 2018, the SEC filed a complaint (the "SEC Complaint") in the Northern District of Illinois against Equitybuild, Inc., Equitybuild Finance, Jerome Cohen, and Shaun Cohen.

59.     The SEC Complaint alleged that the Equitybuild Scheme is a Ponzi scheme and charged the defendants with fraud under the U.S. securities laws.

---

[7]     *See, e.g.* Exhibit 3 at 71 (Confidential Private Offering Memorandum for South Side Development 4, LLC).

60.     The SEC further alleged that the Cohens misused and misappropriated investor money.

61.     The SEC Complaint also alleged that, at the time of its filing, the Cohens' scheme was still ongoing. Indeed, the SEC alleged that although the Cohens began to inform Note investors in May and June of 2018 that they would be unable to continue making interest payments, the Cohens were simultaneously raising new money through investments in its Real Estate Funds, promising "guaranteed" returns and annual interest payments as high as 17%.

62.     On August 15, 2018, the SEC moved for a temporary restraining order, seeking to enjoin the fraud and appoint a Receiver.

63.     The Court granted the motion and appointed a Receiver on August 17, 2018 to take over the assets of the Equitybuild Scheme.

64.     In its case, the SEC has documented that substantially all investor proceeds were deposited into Wells Fargo accounts, and that such investor proceeds were subsequently misappropriated and misdirected from those accounts, including to make Ponzi payments to existing investors.

65.     The SEC Action is currently pending.

**B.     Wells Fargo's Role and Participation in the Equitybuild Scheme**

66.     As detailed below, the Cohens and Equitybuild did not perpetrate the Equitybuild Scheme alone. Instead, the scheme depended on the knowing participation of Wells Fargo, through which investor funds were wired, commingled, and disbursed. Indeed, Wells Fargo knew the accounts it maintained for Equitybuild held investor money, in a fiduciary capacity, and that the Equitybuild managers owed a fiduciary duty to investors as to the money invested in those accounts.

67.     Further, Wells Fargo had knowledge, or was on notice of the fact that investor money was being misused and misappropriated, and at risk of misuse and misappropriation.

68.     Finally, a declaration submitted in the SEC Action by staff accountant at the SEC demonstrates that Wells Fargo was aware that Equitybuild had received far less money from property managers into the Equitybuild accounts than what investors were paid in "interest" out of

those same accounts. Wells Fargo therefore had knowledge that investor proceeds were used to finance investor interest payments, because there simply was not enough actual income generated from the investment programs to cover the amount of "interest payments" owed (and paid) to investors.

### 1. Regulatory Framework Applicable to Wells Fargo's Relationship with Equitybuild and Its Investors

69.     Banks such as Wells Fargo are required by the federal law and applicable regulations to know their customers and understand their banking activities and conduct. They must supervise their customers' accounts and engage in due diligence both at the outset of the relationship and continuously during the relationship with the customer. Such duties are heightened as to customers that are deemed higher-risk, including customers that, like Equitybuild and the Cohens:

(a)     Engage in the management of other people's investments (asset management);

(b)     Employ special use or concentration accounts such as trust or custody accounts intended to facilitate transactions by multiple parties within the same account;

(c)     Engage in lending activities, including non-bank residential mortgage lenders and originators; or

(d)     Offer investment products.

70.     Such higher-risk customers must be subjected to "enhanced due diligence."

71.     Pursuant to applicable banking regulations, a bank is required to collect and maintain information concerning its customers. The bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. § 1020.220(a)(2).

72.     To discharge its duties, the bank is required to collect information about the holder of each account. *Id*. When a corporate entity rather than an individual opens an account, the bank must obtain information about the individuals with authority or control over the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C).

73.     Pursuant to the applicable federal rules and regulations, the bank must develop, administer, and maintain a program that ensures and monitors the bank's compliance with the Bank Secrecy Act ("BSA"). 12 C.F.R. § 21.21. Such program must be approved by the bank's board of directors and noted in the board meeting minutes. A bank's compliance program must include a system of internal controls designed to ensure ongoing compliance, independent testing of the bank's compliance, daily coordination and monitoring of compliance by a designated person, and training of appropriate personnel.

74.     Under the applicable rules and regulations, a bank must also develop a customer due diligence program that assists the bank in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides the bank with a way to identify unusual or suspicious transactions for each customer. A bank's customer due diligence program allows it to maintain an awareness of the unique financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

75.     The Federal Deposit Insurance Corporation ("FDIC") rules and regulations require banks to identify a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA. FDIC Rules & Regulations § 326.8. The compliance officer must designate an individual at each office or branch to monitor the bank's day-to-day compliance with the BSA.

76.     The Federal Financial Institutions Examination Council ("FFIEC") was established by the federal government in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. The FFIEC's Bank Secrecy Act Anti-Money Laundering Manual (the "FFIEC Manual") contains an overview of BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC Manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies such as the Federal Reserve, the FDIC, and the Office of the Comptroller of Currency. *See* FFIEC Manual at 1 and Appendix A (2014).

CLASS ACTION COMPLAINT

77.     The FFIEC identifies entities like Equitybuild, which engage in investment management, finance and lending, and have trust or custodial accounts that hold multiple investors' funds as higher-risk customers. *Id.* at 19-20. The FFIEC further cautions banks that such higher-risk customers must be subjected to "enhanced due diligence" in addition to the typical ongoing due diligence. *Id.* at 56-57. The FFIEC provides special guidance to banks regarding the heightened supervision of customers like Equitybuild, that use their bank accounts in connection with investment management, finance and lending, and operate trust or custodial accounts with transactions for multiple investors' proceeds. *Id.* at 20, 262, 265, 280, and 299 *et seq.*

78.     According to the FFIEC, banks that hold accounts for higher-risk entities such as Equitybuild—which are deemed to be non-bank financial institutions ("NBFI"), *see id.* at 299—should: (1) develop policies, procedures, and processes to assess the risks posed by these particular type of clients; (2) conduct adequate and ongoing customer due diligence; (3) ensure the relationship is appropriately considered within the bank's suspicious activity monitoring and reporting systems; and (4) conduct further due diligence in a manner commensurate with any potential heightened risk. *Id.* at 300-301; *see also* 12 C.F.R. § 21.21 (requiring banks to develop, administer, and maintain a program that ensures compliance with the BSA). The following items—deemed to be "risk factors"—must be evaluated:

    (a)     The types of products or services offered by the NBFI (here, Equitybuild);

    (b)     The locations and markets served by the NBFI;

    (c)     The anticipated account activity; and

    (d)     The purpose of the account.

*Id.* at 300-301.

79.     Customer due diligence policies, procedures and processes are the "cornerstone of a strong BSA/AML compliance program." FFIEC BSA/AML Examination Manual at 56 (2014). This is even more so for those customers who present a higher risk for money laundering, such as Equitybuild. The objective of customer due diligence is to "enable the bank to predict with relative certainty the types of transactions in which a customer is likely to engage." *Id.* An adequate

customer due diligence program should "assist the bank in determining which transactions are potentially suspicious." *Id*.

80.    A bank's customer due diligence ("CDD") processes "should include enhanced CDD for higher-risk customers and ongoing due diligence of the customer base." *Id*. "Enhanced due diligence (EDD) for higher-risk customers is especially critical in understanding their anticipated transactions and implementing a suspicious activity monitoring system that reduces the bank's reputation, compliance, and transaction risks. Higher-risk customers and their transactions should be reviewed more closely at account opening and more frequently throughout the term of their relationship with the bank." *Id*. at 57.

81.    For high-risk accounts such as those operated by Equitybuild, a bank's enhanced due diligence duties may include obtaining, both when the account is opened and throughout the relationship with the customer, information regarding:

(a)    The purpose of the account.

(b)    The source of funds and wealth.

(c)    Occupation or type of business.

(d)    Proximity of the customer's residence, place of employment, or place of business to the bank.

(e)    Description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers.

(f)    Explanations for changes in account activity.

*Id*. at 57-58. Lastly, "[a]s due diligence is an ongoing process, a bank should take measures to ensure account profiles are current and monitoring should be risk-based. Banks should consider whether risk profiles should be adjusted or suspicious activity reported when the activity is inconsistent with the profile." *Id*. at 58.

82.    As part of their customer due diligence for higher-risk customers such as Equitybuild, banks like Defendant are required to apply a risk rating to those customers. To determine Equitybuild's risk rating, Defendant was required to obtain information about

Equitybuild to develop a "transaction profile" that incorporated an understanding of normal and expected activity for Equitybuild's business operations. See *Id.,* Appendix K.

83.     Banks such as Defendant must also ensure that their employees are following BSA guidelines. Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations.

84.     Accordingly, banks such as Defendant are required to train all operational personnel whose duties may require knowledge of the BSA, on the BSA, including identification of various "red flags" discussed below. *See* FFIEC Manual at 32-33.

85.     The FFIEC has identified "red flags" that should cause a bank or its employees to inquire further and potentially file a suspicious activity report. The Equitybuild investment accounts triggered at least the following "red flags," which resulted in Defendant's review of Equitybuild and the accounts:

(a)     Frequent and large deposits or withdrawals with no apparent business source;

(b)     Frequent wire transfers not justified by the nature of the business;

(c)     Accounts with a high volume of activity;

(d)     High volume of wire transfers with low balance;

(e)     Inconsistent deposit and withdrawal activity;

(f)     Transactions that are not consistent with the customer's business;

(g)     Intrabank transfers between accounts owned or controlled by the same individuals;

(h)     Appearance of using account as a temporary repository for funds;

(i)     Deposits and immediate requests for wire transfers or cash shipments; and

(j)     Large deposits.

86.     Banks such as Defendant must investigate red flags that could indicate suspicious activity. *Id*. at 269. Such investigation must include the review of customer documents. "Reliable documentation is critical in identifying potentially suspicious activity." *Id*.

CLASS ACTION COMPLAINT

18

87.     Pursuant to its BSA/anti-money laundering ("AML") duties, Defendant learned that Equitybuild qualified as a high-risk business that warranted enhanced due diligence.

88.     Pursuant to its BSA/AML duties, Defendant had an opportunity to review, and reviewed Equitybuild and its accounts, thus learning that:

(a)     Equitybuild was a real estate investment and lending business that pooled investor money;

(b)     Equitybuild received and held in its Wells Fargo accounts investment proceeds from investors;

(c)     Equitybuild and the Cohens were managing investor money as fiduciaries, and the Equitybuild accounts held fiduciary funds;

(d)     Equitybuild and the Cohens were misusing investor funds from the Equitybuild accounts, by commingling such funds and transferring them to the Cohens and other entities whose business was unrelated to Equitybuild's real estate investment and lending;

(e)     Equitybuild and the Cohens were misusing investor money for Ponzi payments;

(f)     Equitybuild was primarily a Ponzi scheme, not a real business.

**2.     Wells Fargo Knew That It Received Investor Funds into Equitybuild's Accounts and That Money from Those Accounts Was Sent to Investors as Interest Payments, in Ponzi Fashion**

89.     At the outset of Wells Fargo's relationship with Equitybuild, Wells Fargo was required by its internal policies and procedures and applicable laws and regulations to conduct due diligence as to Equitybuild, including enhanced due diligence, as shown above, and did conduct such due diligence.

90.     By virtue of such due diligence, Wells Fargo learned the nature of Equitybuild's business, and understood that Equitybuild was an investment vehicle and was soliciting and receiving money from investors, to be managed and invested in real estate by Equitybuild and its principals for the investors' benefit.

91.     Further, Wells Fargo also learned of the nature of Equitybuild's business and understood that Equitybuild was an investment vehicle and was soliciting and receiving money

from investors to be managed and invested in real estate by Equitybuild and its principals for the investor benefit because (1) it manually processed a massive number of wires that on their face indicated that they deposited investor proceeds in the Equitybuild accounts maintained by Wells Fargo, to be managed and/or invested by Equitybuild, and (2) it made available and/or accepted for use a direct deposit form that indicated that the money it held in the Equitybuild accounts belonged to investors and was managed by Equitybuild.

92.     Wells Fargo was therefore aware that Equitybuild was managing investor funds and that Equitybuild was a fiduciary to those investors (i.e., Plaintiffs and the class).

93.     A review of the documents Plaintiffs used to send and receive payments to and from Equitybuild for purposes of Equitybuild's investment programs further demonstrates that Wells Fargo knew that Equitybuild was managing investor funds, and that those funds were commingled among Equitybuild's various accounts with Wells Fargo.

94.     Indeed, documents that Equitybuild provided investors—and that Wells Fargo knew Equitybuild provided investors—demonstrate that Wells Fargo knew that: (1) money was regularly being sent by *investors* to Equitybuild and deposited into Wells Fargo accounts; (2) Equitybuild was making regular payments to *investors* out of these same Wells Fargo accounts, and by using proceeds deposited by other investors; and (3) the money being sent to investors represented supposed interest on the investors' investments. Further, Wells Fargo actively modified, or consented to the modification of, its boilerplate Direct Deposit Authorization Forms to facilitate Ponzi payments by the Equitybuild Scheme—a deviation from its standard course of business that also demonstrates Wells Fargo's knowledge and substantial assistance.

95.     Moreover, Wells Fargo was aware that the Equitybuild investment programs were real estate investment pools or funds, to which the pools' or funds' managers (the Cohens and Equitybuild) owed fiduciary duties.

96.     Importantly, the only bank that Equitybuild used for the Equitybuild Scheme was Wells Fargo. Thus, all transactions (i.e., money coming from and going to investors) were processed through Wells Fargo, which pursuant to its BSA/AML duties as well as its manual processing of a massive number of wires in the accounts had a full and complete view of the

Equitybuild's accounts and regularly reviewed them, and thus acquired knowledge of the misappropriation and misuse of investor funds in Ponzi fashion.

(a)    <b><u>The Wells Fargo Wire Instruction Forms</u></b>

97.    The wiring instructions that investors used to send money to Equitybuild's Wells Fargo accounts show that Wells Fargo knew Equitybuild was receiving investor funds.

98.    For example, on May 23, 2016, Plaintiff Melanie Gonzales completed and electronically signed a Wire Transfer Instruction document she received from Equitybuild.[8] The form, which is identical to other forms that Plaintiffs and the class filled out, made clear that investors were instructed to send money to "Wells Fargo Bank, N.A.", and listed "Equitybuild, Inc." as the "Beneficiary." The form also listed the specific Equitybuild account to which the funds would be sent, and although there were different accounts listed depending on the specific property at issue, most investor funds were sent to account ending in *******992, as detailed below:



---

[8]    *See* Exhibit 4.

99.     Because all investors in the Equitybuild programs were instructed to send money to Wells Fargo using these forms, Wells Fargo was aware that it was receiving money into Equitybuild's various accounts—especially the account ending in *******992—from a large number of different individuals and entities as part of investments in different Equitybuild investment programs. Wells Fargo was also aware, through its customer due diligence and "know your customer" processes and review of the Equitybuild account transactions and documents, that Equitybuild and its principals invested and managed investor money in real estate investment programs, thus acting in a fiduciary capacity. Wells Fargo therefore knew it was receiving investor money into Equitybuild's accounts.

100.    Wells Fargo also knew that Equitybuild was regularly transferring hundreds of thousands of dollars between its accounts at Wells Fargo—clear evidence that Equitybuild was commingling investor money. Indeed, a former Equitybuild employee confirmed that it has her job to "constantly" transfer hundreds of thousands of dollars between the Equitybuild accounts at Wells Fargo.

101.    Moreover, as detailed below, Wells Fargo was aware that it was sending investors "interest payments" pursuant to Direct Deposit Authorization Forms that each investor executed, and that these "interest payments" were being paid out of the very same accounts into which it was receiving money via wire.

(b)     **The Wells Fargo Direct Deposit Authorization Forms**

102.    The Wells Fargo Direct Deposit Authorization Forms that Equitybuild provided investors demonstrate that Wells Fargo was aware that the money it was holding in its Equitybuild accounts was investor money, and that it was transferring money to other investors from these same accounts, at Equitybuild's request, as supposed distribution payments in Ponzi scheme fashion. Wells Fargo's knowledge is further demonstrated by its customer due diligence and "know your customer" processes and review of the Equitybuild account transactions and documents.

103.    Wells Fargo actively modified and/or accepted and used a modified version of its Direct Deposit Authorization Forms to apply to the payment of investment distributions to

Equitybuild investors—a deviation from the standard course of business that demonstrates Wells Fargo's substantial assistance in Equitybuild's fraud and breach of fiduciary duty.

104.   For example, on March 16, 2015, Plaintiff AIRE executed a Wells Fargo Direct Deposit Authorization Form—a form that is typically used to allow an employer to make regular payroll deposits into the bank account of an employee.[9] The form used in this case for Plaintiff AIRE—an "Investor," not an employee, as the Wells Fargo form itself attests—appears to be a modified version of the form typically used for employer-employee transactions.

105.   This form (as further described below) is identical to other forms that Plaintiffs and the class filled out.

106.   The Direct Deposit Authorization Form refers to Wells Fargo's "Business Payroll Services" at the top, and also states as follows above the signature line: "I authorize *my employer* to make deposits into my account. In the unlikely event of a deposit error, I authorize *my employer* to make adjustments to correct the error."[10] Thus, certain portions of the Direct Deposit Authorization Form contemplated that the signer would be an employee, not an investor—which is what would be expected on a typical direct deposit authorization form.



**5. Authorization Agreement For Direct Deposit**

*Please note, it can take 6-10 business days to process your direct deposit request and or you to begin receiving direct deposits.*

*I authorize my employer to make deposits to my account. In the unlikely event of a deposit error, I authorize my employer to make adjustments to correct the error.*

Signature                                                                         Date
DocuSigned by:                                                              3/16/2015
Chuchun Lin
AB7466568FBF461

107.   However, other portions of the Direct Deposit Authorization Form refer to the signer as an investor, and not an employee. Indeed, the form references "Investor Information," including name and social security number (and EIN number to the extent the "Investor" is an LLC).

---

[9]     *See* Exhibit 1.

[10]     *Id.* (emphasis added).

**2. Investor Information (Individual)**

| Last Name | First Name | MI |
|---|---|---|
| | | |

Social Security Number (SSN) for year-end tax notification only.

**2. Investor Information (LLC)**

Business Name    Asians Investing In Real Estate LLC

108.    Wells Fargo sought to accommodate Equitybuild's Ponzi scheme, in a material departure from its practice, and to that extent actively modified and/or accepted and used a modified version of its the Direct Deposit Authorization Forms typically used for employer-employee relationships so that the forms reflected that Equitybuild was transferring money (via direct deposits) to investors, not employees—i.e., a deviation from the standard course of business in processing payments Equitybuild made from its accounts to investors.

109.    Wells Fargo's efforts to accommodate Equitybuild's scheme is confirmed by a former Equitybuild employee, who explained that Equitybuild's contact at Wells Fargo "seemed like she was willing to do pretty much anything" for Jerry Cohen.

110.    This, coupled with Wells Fargo's knowledge of the operations in the account, as more fully described above, also demonstrates that Wells Fargo knew Equitybuild was transferring fiduciary money from its accounts to *investors* as supposed distribution payments, in Ponzi scheme fashion. Indeed, it was clear to Wells Fargo that the person filling out the authorization was an Equitybuild investor (because it made and approved the changes to these boilerplate forms) and it did so to accommodate Equitybuild business.

111.    Moreover, Wells Fargo made and/or accepted and adopted additional manual changes over time to the Direct Deposit Authorization Forms (as detailed below), further demonstrating Wells Fargo's knowledge and participation in the Equitybuild Scheme's Ponzi transactions.

112.    In 2015, as reflected in the Direct Deposit Authorization Forms described above, the Forms had notations typical of payroll contributions to a 401K-type of account, where an

employee could choose to deposit either a fixed amount or a percentage of salary—an option that makes sense on an employee direct deposit authorization form.



113.    However, this option made little sense in the context of the investor relationship (and presumably confused investors), and so Wells Fargo modified and/or accepted the modified forms in 2016 to reflect that the transfer was for "*interest*" on investments:[11]



114.    Thus, Wells Fargo participated in modifying and/or accepting a modified form of the Direct Deposit Authorization Forms to more accurately reflect that the form **applied specifically to the payment of investment distributions to investors**, which demonstrates Wells Fargo's **knowledge** that it was disbursing interest payments to investors.

115.    Further, Wells Fargo's knowledge that all distribution payments to investors—regardless of the programs in which the investors invested—came from the same Equitybuild account demonstrates that Wells Fargo knew that fiduciary/investor money in different investment programs was being commingled, a facial breach of fiduciary duty.

116.    Wells Fargo therefore actively modified and/or accepted and used modified versions of its Direct Deposit Authorization Forms for Equitybuild, demonstrating that Wells Fargo was aware that (1) Equitybuild was sending money to **investors** (i.e., fiduciaries), (2) the Equitybuild Scheme was commingling investor money in clear violation of its fiduciary duties,

---

11      *See* Exhibit 5 (emphasis added).

and (3) the money being sent to investors represented investment distributions (i.e., "interest" payments). In view of Wells Fargo's knowledge that the money it sent to investors on Equitybuild's behalf came from other investors, Wells Fargo was thus aware that it was participating in, and facilitating, a Ponzi scheme.

117.    In sum, the Direct Deposit Authorization Forms and the wire instructions, coupled with Wells Fargo's knowledge of the operations in the Equitybuild account as acquired through its regular review of the account pursuant to its customer due diligence and "know your customer duties" and its manual processing of a large number of wires, all demonstrate that Wells Fargo knew that: (1) the money Wells Fargo was receiving in the Equitybuild accounts came from investors (and investors were instructed to send money to Wells Fargo); (2) this money was an investment in Equitybuild programs to be managed by Equitybuild and its principals as fiduciaries, i.e., fiduciary money; (3) the money Wells Fargo was disbursing via direct deposits was going to investors as supposed interest on their investments; (4) those fiduciary funds were being commingled across the various Equitybuild entities and programs; and (5) money was being sent from investors to Equitybuild via the wire instructions, but sent to investors from Equitybuild via the Direct Deposit Authorization Forms—notwithstanding that the same accounts were being used to receive and distribute funds.

118.    Because Wells Fargo was the only financial institution that Equitybuild used, Wells Fargo processed all transactions for the Equitybuild Scheme, including the payments *from investors* via wire instructions into its Equitybuild accounts and the payments *to investors* via direct deposits from those same accounts.

119.    Thus, for the reasons set forth above, Wells Fargo knew it was processing money to and from investors and participating and assisting a Ponzi scheme. In fact, Wells Fargo actively modified the Direct Deposit Authorization Forms so that they more accurately reflected that it was sending money to investors—a fact that further demonstrates Wells Fargo's knowledge and substantial assistance in the Equitybuild Scheme.

       (c)      **Real Estate Investment Fund Accounts Held by Wells Fargo**

120.    Wells Fargo also knew that the Cohens began to raise money through investment funds, to which the Cohens (as fund managers) owed a fiduciary obligation.

121.    Indeed, the Real Estate Funds' offering material explained that the funds at issue had "established an Investment Holding Account with Wells Fargo Bank," into which offering proceeds would be placed.[12]

122.    At least one of those Real Estate Funds' offering materials characterized the Wells Fargo account where investor money was to be deposited as an escrow account.

123.    Because the Cohens opened accounts in the name of LLCs that were named after various investment funds—and "established Investment Holding Accounts with Wells Fargo Bank"—Wells Fargo was further aware that its accounts included fiduciary money.

### 3.    Wells Fargo Knew Equitybuild Frequently Bounced Checks

124.    According to a former Equitybuild employee, Equitybuild frequently bounced checks due to depleted funds in the Equitybuild accounts. The bounced checks were for thousands of dollars, and in some cases they were in the $20,000-$30,000 range.

125.    One former Equitybuild employee explained that she had to get instructions from the Cohens every time she wanted to write or send out checks because there was rarely money to cover them.

126.    Wells Fargo was therefore aware that Equitybuild was bouncing checks due to depleted funds.

### 4.    Wells Fargo Knew That Equitybuild Was Financing Interest Payments to Investors with Other Investors' Money, Rather Than with Income Generated by the Investment Programs.

127.    Not only did Wells Fargo know that it held fiduciary funds in its accounts and that such money was being misused when investors were sent supposed "interest payments" from those same accounts, but Wells Fargo also knew that the income Equitybuild was receiving from the investment programs was far less than what was being disbursed to investors as supposed "interest

---

[12]    *See* Exhibit 3 at 71 (Confidential Private Offering Memorandum for South Side Development 4, LLC).

payments." It learned about it through the regular review of the Equitybuild account and transaction in the account pursuant to its customer due diligence and "know your customer duties" and its manual processing of a large number of investor wires.

128.    Indeed, as part of the SEC's August 15, 2018 motion for a temporary restraining order in the SEC Action, the SEC submitted a declaration of Ann Tushaus (the "Tushaus Declaration"), a staff accountant in the Division of Enforcement in the SEC's Chicago Regional Office.

129.    Tushaus described how she had reviewed bank records of Equitybuild, Inc., Equitybuild Finance, Jerome Cohen, and Shaun Cohen, including: account opening documents, bank signatory forms, canceled checks, monthly statements, deposits, debit and credit memoranda, and wire transfer advices.

130.    Based her review, Tushaus explained that "bank records show[] that [Equitybuild, Inc.] and Equitybuild Finance used proceeds of the investments described herein to make interest and principal payments to investors" and that "investor proceeds were used to make payments to Jerome Cohen, Shaun Cohen, and LLCs they own and control . . . ."

131.    Moreover, the Tushaus Declaration states: "[F]rom September 1, 2013 to May 2018, Jerome Cohen and Shaun Cohen each received approximately $1.5 million as a result of the investments described herein. Jerome Cohen received these funds through transfers from Equitybuild bank accounts to accounts in his name and the name of the company he owns and controls called Tikkun Holdings LLC. Shaun Cohen received his money through transfers from Equitybuild bank accounts to accounts in his name and the name of a company he owns and controls called 3400 Newkirk LLC. The bank records reflect that Jerome Cohen and Shaun Cohen used this money to pay for living expenses."

132.    Thus, Wells Fargo was aware that the investor money it received in Equitybuild accounts—the same accounts out of which investors were paid "interest" payments—was being misused and siphoned by Jerome and Shaun Cohen, a clear misuse of fiduciary funds and breach of fiduciary duties.

133.    Moreover, the Tushaus Declaration sates: "My review and analysis of Equitybuild's bank records indicates that from January 2015 through February 2017, investors received approximately $14.5 million in interest payments from Equitybuild. My analysis indicates that during the same period, the money transferred to Equitybuild from property managers and third-party buyers' monthly payments amounted to only $3.8 million. Based on this analysis, it appears that Equitybuild used investor proceeds to make investor interest payments."

134.    Thus, Wells Fargo—the bank that processed all transactions of money coming in to and out of Equitybuild's accounts—was aware that Equitybuild had received far less money from property managers into the Equitybuild accounts than what investors were paid in "interest" out of those same accounts. It acquired such knowledge through the regular review of the Equitybuild account and transaction in the account pursuant to its customer due diligence and "know your customer duties" and its manual processing of a large number of investor wires. Wells Fargo therefore knew that investor proceeds were used to finance investor interest payments, because there simply was not enough actual income generated from the investment programs to cover the amount of "interest payments" owed (and paid) to investors.

135.    Thus, Wells Fargo had knowledge of, and participated in, the Equitybuild Ponzi scheme and breach of fiduciary duties to investors.

## VII.    CLASS ACTION ALLEGATIONS

136.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who invested in the Equitybuild Scheme and who were damaged thereby (the "Class").

137.    Excluded from the Class are (1) Defendant, (2) any person, firm, corporation, or other entity related to or affiliated with Defendant, or in which the Defendant has or had a controlling interest; (3) Jerome Cohen, Shaun Cohen, and any other employee of Equitybuild, Inc. or Equitybuild Finance; (4) members of the immediate family of Jerome Cohen or Shaun Cohen; and (5) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

CLASS ACTION COMPLAINT

138. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members remains unknown at this time, it is estimated that the Class includes nearly 900 individuals who reside across the United States. The exact number of Class members is within the knowledge of Defendant and/or the court-appointed Receiver in the SEC Action.

139. **Commonality**. There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Class, including, among others:

(a) Whether the Equitybuild Scheme Perpetrators defrauded investors, misused investor money, and/or commingled investment proceeds from different investment programs;

(b) Whether the Equitybuild Scheme was a Ponzi scheme;

(c) Whether Wells Fargo breached the duties it owed to Plaintiffs and the Class by failing to conform its conduct to the requirements of the law and applicable regulations;

(d) Whether Wells Fargo knew that the Equitybuild Scheme Perpetrators were misusing and commingling investor money and/or using such money for Ponzi scheme payments;

(e) Whether Wells Fargo knowingly provided substantial assistance to the Equitybuild Scheme Perpetrators;

(f) Whether Wells Fargo was negligent in its oversight of the Equitybuild accounts;

(g) Whether Wells Fargo's misconduct entitles Plaintiffs and members of the Class to damages for the loss of the amounts invested by Plaintiffs and members of the Class; and

(h) What remedies are appropriate compensation for the damages caused to Plaintiffs and each member of the Class.

140. **Typicality**. The claims of Plaintiffs are typical of all Class members. The claims of Plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class. Plaintiffs are situated identically to all members of the Class with respect to issues presented in this case, as Plaintiffs and all members of the Class were investors

1  in the Equitybuild Scheme and suffered the exact same type of loss (in proportion to their

2  investment).

3       141.  ***Adequacy***. Plaintiffs will adequately represent and protect the interests of the Class

4  and have no interests that conflict with or are antagonistic to the interests of the Class. Plaintiffs

5  have retained attorneys who are experienced in, and capable of prosecuting, complex class actions

6  such as this case. The attorneys for Plaintiffs and the Class will actively conduct and be responsible

7  for the prosecution of this litigation and the expenses thereof. The attorneys for Plaintiffs have

8  adequate resources, experience, and commitment to litigate this matter.

9       142.  ***Predominance and Superiority***. A class action is superior to any other method

10  available for the fair and efficient adjudication of this controversy because it would be impractical

11  and undesirable for each of the individual Class members who have suffered damages to bring

12  separate actions. There will be no difficulty in the management of this action as a class action.

13  Moreover, the common issues identified above predominate over individual issues, if any,

14  particular to each Class member.

15

16  **VIII.   CAUSES OF ACTION**

17  **COUNT I**

18  **<u>Aiding and Abetting Fraud</u>**

19       143.  Plaintiffs repeat and re-allege each of the allegations contained in the foregoing

20  paragraphs as if fully set forth herein.

21       144.  As detailed above, the Equitybuild Scheme was fraudulent because, among other

22  reasons, the Equitybuild Scheme Perpetrators made material misrepresentations and omissions and

23  knowingly failed to disclose to its investors that: the Equitybuild Scheme was a Ponzi scheme and

24  investor money was being used to make supposed distribution payments to other investors; the

25  investor money was commingled across all programs; the Cohens were misappropriating and

26  misusing investor funds for their personal expenses.

27       145.  Equitybuild's business did not generate enough revenue to fund the investors'

28  interest payments and so the Equitybuild Scheme Perpetrators financed promised interest

payments with fresh investor funds, in Ponzi fashion. They further commingled investor money in the same accounts, from which they made such Ponzi payments. Lastly, in addition to making Ponzi payments to investors, the Cohens also paid themselves handsomely—and improperly— with investor money.

146.    These misrepresentations and omissions were material—indeed essential—to the investors, who had no reason to believe that their money would not be used as intended and as represented.

147.    The Equitybuild Scheme Perpetrators intended the investors to rely on such misrepresentations and omissions, and the investors did rely when investing.

148.    Investors were injured when their money was obtained through fraud, as more fully described above, by being directed to deposit their money into Wells Fargo operating/custodial/trust accounts, from which the parts of their investment proceeds were improperly withdrawn, where their proceeds were commingled across the various Equitybuild entities, and from which funds were withdrawn to make Ponzi scheme payments to other investors.

149.    Wells Fargo knowingly provided substantial assistance to the Equitybuild Scheme's fraud by:

(a)      receiving money via wire transfer from investors into Equitybuild's Wells Fargo operating/custodial/trust accounts;

(b)      overseeing the commingling of these funds between and Equitybuild's Wells Fargo operating/custodial/trust accounts;

(c)      modifying and/or accepting and using modified Direct Deposit Authorization Forms, which were sent to Plaintiffs and the Class, to accommodate Equitybuild's Ponzi scheme, so that these forms reflected that the money being disbursed was interest on investors' investments, rather than payments to employees—a deviation from the standard course of business;

(d)      divesting and misdirecting a significant portion of the investors' money to the Cohens' personal accounts; and

(e)     transferring Ponzi scheme payments to investors via direct deposit, which investors believed to be "interest payments" owed on their investments, with knowledge that such money came from investment proceeds deposited by other investors.

150.    The transactions that Wells Fargo executed, and the means by which they were executed (such as the unusual accommodation through the modification of a direct deposit form used for payroll) were highly atypical, both in nature and frequency.

151.    Wells Fargo received substantial compensation for such transactions, which incentivized Wells Fargo to turn a blind eye and continue to substantially assist the Equitybuild Scheme Perpetrators.

152.    As more fully described above, Wells Fargo acquired actual knowledge of the fraudulent Equitybuild Scheme because:

(a)     Wells Fargo conducted due diligence when it entered into its business relationship with Equitybuild and thereafter throughout its business relationship with Equitybuild and the Cohens, as required by the banks internal policies and procedures, as well as by applicable laws and regulations;

(b)     by virtue of this due diligence, Wells Fargo regularly reviewed Equitybuild's accounts, learned the nature of Equitybuild's business and operations and understood that Equitybuild was an investment vehicle and was soliciting and receiving money from investors ostensibly to be managed by Equitybuild and its principals as fiduciaries, and invested in real estate investment programs;

(c)     Wells Fargo also regularly reviewed the Equitybuild accounts by virtue of manually processing a substantial number of wires in those accounts, representing investor deposit of investment proceeds;

(d)     Through its frequent review of Equitybuild's accounts, Wells Fargo learned that Equitybuild and its principals were orchestrating Ponzi payments of "interest" to existing investors, with money from new investors; were improperly commingling investor funds intended to be invested in different investment programs, and were using some of that money for Ponzi payments; and were misusing and siphoning investor money to their personal accounts;

(e)     Specifically, Wells Fargo knew that it was receiving payments from investors, and that this money was then deposited into Equitybuild's Wells Fargo accounts;

(f)     Wells Fargo knew that such investor money was an investment in Equitybuild investment programs—including many that had the word "Fund" in their names, and that it was fiduciary money;

(g)     Wells Fargo knew that investor money was improperly commingled among the various Equitybuild investment programs, in accounts it held for Equitybuild;

(h)     Wells Fargo knew that investor money was being used to make Ponzi "interest" payments to existing investors;

(i)     In an effort to facilitate Equitybuild's Ponzi payments, Wells Fargo modified and/or used modified Direct Deposit Authorization Forms, which were sent to Plaintiffs and the Class, so that these forms reflected that the money being disbursed was interest on investors' investments, rather than payments to employees;

(j)     Wells Fargo therefore knew that investor money from Equitybuild's accounts was improperly being disbursed to other investors as supposed interest on their investments, in Ponzi fashion;

(k)     Wells Fargo also knew that the Cohens were siphoning investor, fiduciary money intended to be invested in Equitybuild's real estate investment programs, and improperly transferring such money to their personal accounts; and

(l)     Wells Fargo also knew that the income Equitybuild was receiving from the investment programs was far less than what was disbursed to investors as supposed "interest payments," and that Equitybuild was therefore using investor funds to finance those interest payments.

153.    By virtue of its substantial and material assistance to the Equitybuild Scheme, Wells Fargo was aware of its role in the Equitybuild Scheme's fraudulent activity and it acted knowingly in assisting the Equitybuild Scheme.

154.    In the alternative, as an escrow agent/trustee/custodian for the Equitybuild investors' money, Wells Fargo owed to Plaintiffs and the Class members a fiduciary duty with

respect to Plaintiffs' and Class members' fiduciary money deposited in accounts and under its oversight and custody, and/or a duty to safeguard such money and avoid assisting in its misuse and/or misappropriation.

155.    Wells Fargo breached its duty owed to Plaintiffs and the Class members by substantially assisting the Equitybuild Scheme's fraudulent activities as more fully described above.

156.    Wells Fargo's misconduct was the proximate cause of Plaintiffs' and Class members' losses, because it directly and proximately resulted in the misuse and misappropriation of their investments. Indeed, Wells Fargo modified the Direct Deposit Authorization Forms and therefore assisted in disbursing funds to investors as supposed "interest payments" on their investments, despite knowing that Equitybuild did not earn enough income on the investment programs to finance those interest payments, and that Ponzi payments were used instead. These were the final acts of the fraud process that caused the loss of the Equitybuild investors' money.

157.    As a direct and proximate consequence of Wells Fargo's misconduct as described in the foregoing and throughout this Complaint, Plaintiffs and members of the Class have lost a substantial portion of the money they invested in the Equitybuild Scheme, in an amount to be determined but well in excess of $5,000,000.

## COUNT II

### Aiding and Abetting Breach of Fiduciary Duty

158.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

159.    As set forth herein, the Equitybuild Scheme Perpetrators owed fiduciary duties to the Equitybuild investors because the Equitybuild investors placed their trust and confidence in the Equitybuild Scheme Perpetrators to manage the real estate investments and invest their money appropriately, and had to entirely rely on the Equitybuild Scheme Perpetrators to appropriately invest and manage their money and the properties ostensibly purchased with that money. The Equitybuild Scheme Perpetrators touted their superior knowledge, diligence, and expertise in

managing real estate investments. Investors relied on these representations, and entrusted their money to the Equitybuild Scheme Perpetrators because they believed that the Equitybuild Scheme Perpetrators would use their superior skill and expertise to manage the investments.

160.    The Equitybuild Scheme Perpetrators breached their fiduciary duties to the Equitybuild investors by, among others, defrauding them and by misusing, commingling, and converting their money, as more fully detailed above.

161.    Wells Fargo knew that the Equitybuild Scheme Perpetrators were fiduciaries of the investors and that fiduciary, investor money was being deposited in its operating/escrow/trust accounts for the Equitybuild Scheme Perpetrators to manage in a fiduciary capacity; was aware that the Equitybuild Scheme Perpetrators were breaching their fiduciary duties to the investors by (1) commingling investor money; (2) misusing and misappropriating investor money intended to be invested in various Equitybuild investment programs and instead improperly transferring such money to the Cohens; (3) using new investor funds deposited in such accounts to make "interest payments" to existing investors, in typical and obvious Ponzi scheme fashion; and (4) running a "shell" operation to cover up the Ponzi scheme, where in reality the income deposited into the Equitybuild accounts from the underlying real estate properties was far less than the amount of money being disbursed to investors as "interest payments."

162.    Well Fargo knowingly provided substantial assistance to the Equitybuild Scheme Perpetrators' breach of fiduciary duty to the Equitybuild investors by facilitating the improper transfers and use of investor money with knowledge that such money was fiduciary funds and its improper use and transfer was a breach of Equitybuild and its perpetrators' fiduciary duties owed to the investors, and by otherwise knowingly accommodating the Cohens and Equitybuild in the course of their breaches of fiduciary duties owed to the investors, including by:

(a)    receiving money via wire transfer from investors into Equitybuild's Wells Fargo operating/custodial/trust accounts with knowledge that such investor, fiduciary money was being misused and misappropriated;

(b)    overseeing the improper commingling of these funds between Equitybuild's Wells Fargo operating/custodial/trust accounts;

CLASS ACTION COMPLAINT

   (c) modifying and/or accepting and using modified Direct Deposit Authorization Forms, which were sent to Plaintiffs and the Class, to accommodate Equitybuild's Ponzi scheme, so that these forms reflected that the money being disbursed was interest on investors' investments, rather than payments to employees—a deviation from the standard course of business;

   (d) divesting and misdirecting a significant portion of the investors' money to the Cohens' personal accounts; and

   (e) transferring Ponzi scheme payments to investors via direct deposit, which investors believed to be "interest payments" owed on their investments, with knowledge that such money came from investment proceeds deposited by other investors.

  163. Such transactions as Wells Fargo executed were highly atypical, both in nature and in frequency. Further, the accommodations that Wells Fargo offered to the Equitybuild Scheme Perpetrators, to facilitate their scheme, such as the modified direct deposit forms, were atypical and a material departure from its regular course of business.

  164. Wells Fargo received substantial compensation for such transactions and such compensation gave it the incentive to turn a blind eye and continue to assist the Equitybuild Scheme Perpetrators' breach of fiduciary duty.

  165. As more fully described above, Wells Fargo acquired actual knowledge of the widespread breach of fiduciary duty by the Equitybuild Scheme Perpetrators year after year, in particular because:

   (a) Wells Fargo conducted due diligence when it entered into its business relationship with Equitybuild and thereafter throughout its business relationship with Equitybuild and the Cohens, as required by the banks internal policies and procedures, as well as by applicable laws and regulations;

   (b) by virtue of this due diligence, Wells Fargo regularly reviewed Equitybuild's accounts, learned the nature of Equitybuild's business and operations and understood that Equitybuild was an investment vehicle and was soliciting and receiving money

1   from investors ostensibly to be managed by Equitybuild and its principals as fiduciaries, and

2   invested in real estate investment programs;

3            (c)   Wells Fargo also regularly reviewed the Equitybuild accounts by virtue of

4   manually processing a substantial number of wires in those accounts, representing investor deposit

5   of investment proceeds;

6            (d)   Through its frequent review of Equitybuild's accounts, Wells Fargo learned

7   that Equitybuild and its principals were orchestrating Ponzi payments of "interest" to existing

8   investors, with money from new investors; were improperly commingling investor funds intended

9   to be invested in different investment programs, and were using some of that money for Ponzi

10  payments; and were misusing and siphoning investor money to their personal accounts;

11           (e)   Specifically, Wells Fargo knew that it was receiving payments from

12  investors, and that this money was then deposited into Equitybuild's Wells Fargo accounts;

13           (f)   Wells Fargo knew that such investor money was an investment in

14  Equitybuild investment programs—including many that had the word "Fund" in their names, and

15  that it was fiduciary money;

16           (g)   Wells Fargo knew that investor money was improperly commingled among

17  the various Equitybuild investment programs, in accounts it held for Equitybuild;

18           (h)   Wells Fargo knew that investor money was being used to make Ponzi

19  "interest" payments to existing investors;

20           (i)   In an effort to facilitate Equitybuild's Ponzi payments, Wells Fargo

21  modified and/or used modified Direct Deposit Authorization Forms, which were sent to Plaintiffs

22  and the Class, so that these forms reflected that the money being disbursed was interest on

23  investors' investments, rather than payments to employees;

24           (j)   Wells Fargo thus knew that investor money from Equitybuild's accounts

25  was improperly being disbursed to other investors as supposed interest on their investments, in

26  Ponzi fashion;

27

28

(k)     Wells Fargo also knew that the Cohens were siphoning investor, fiduciary money intended to be invested in Equitybuild's real estate investment programs, and improperly transferring such money to their personal accounts; and

(l)     Wells Fargo also knew that the income Equitybuild was receiving from the investment programs was far less than what was disbursed to investors as supposed "interest payments," and that Equitybuild was therefore using investor funds to finance those interest payments.

166.    By virtue of its substantial and material assistance to the Equitybuild Scheme, Wells Fargo was aware of its role in the Equitybuild Scheme Perpetrators' breach of fiduciary duty to the Equitybuild investors and it acted knowingly in assisting such breach of fiduciary duty.

167.    In the alternative, as an escrow agent/trustee/custodian for the Equitybuild funds' investors' money, Wells Fargo owed to Plaintiffs and the Class members a fiduciary duty with respect to Plaintiffs' and Class members' fiduciary money deposited in accounts and under its oversight and custody, and/or a duty to safeguard such money and avoid assisting in its misuse and/or misappropriation.

168.    Wells Fargo breached its duty owed to Plaintiffs and the Class members by substantially assisting the Equitybuild Scheme Perpetrators' own breach of fiduciary duty as more fully described above.

169.    Wells Fargo's misconduct was the proximate cause of Plaintiffs' and Class members' losses, because it directly and proximately resulted in the loss of their investments. Indeed, Wells Fargo modified the Direct Deposit Authorization Forms and therefore assisted in disbursing funds to investors as supposed "interest payments" on their investments, despite knowing that Equitybuild did not earn enough income on the investment programs to finance those interest payments, and that Ponzi payments were used instead. These were the final acts of the fraud process that caused the loss of the Equitybuild investors' money.

170.    As a direct and proximate consequence of Wells Fargo's misconduct as described in the foregoing and throughout this Complaint, Plaintiffs and members of the Class have lost a

substantial portion of the money they invested in Equitybuild, in an amount to be determined at trial but well in excess of $5,000,000.

## COUNT III

### Negligence

171.    Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

172.    In its capacity as a trustee/custodian for the Equitybuild funds' investors' money, Wells Fargo owed Plaintiffs and Class members a duty to safeguard and manage Plaintiffs' and Class members' funds in accordance with Plaintiffs' and Class members' expectations as investors in the Equitybuild funds.

173.    In the alternative, Wells Fargo owed Plaintiffs and Class members a duty of care because Wells Fargo (a) knew that a fiduciary relationship existed between Equitybuild and investors; (b) knew that it held fiduciary funds in Equitybuild's Wells Fargo accounts; (c) knew and/or was on notice that that investor funds were being misappropriated and/or were at risk of being misappropriated.

174.    Indeed, as more fully described above, Wells Fargo acquired such actual knowledge because:

(a)     Wells Fargo conducted due diligence when it entered into its business relationship with Equitybuild and thereafter throughout its business relationship with Equitybuild and the Cohens, as required by the banks internal policies and procedures, as well as by applicable laws and regulations;

(b)     by virtue of this due diligence, Wells Fargo regularly reviewed Equitybuild's accounts, learned the nature of Equitybuild's business and operations and understood that Equitybuild was an investment vehicle and was soliciting and receiving money from investors ostensibly to be managed by Equitybuild and its principals as fiduciaries, and invested in real estate investment programs;

(c)     Wells Fargo also regularly reviewed the Equitybuild accounts by virtue of manually processing a substantial number of wires in those accounts, representing investor deposit of investment proceeds;

(d)     Through its frequent review of Equitybuild's accounts, Wells Fargo learned that Equitybuild and its principals were orchestrating Ponzi payments of "interest" to existing investors, with money from new investors; were improperly commingling investor funds intended to be invested in different investment programs, and were using some of that money for Ponzi payments; and were misusing and siphoning investor money to their personal accounts;

(e)     Specifically, Wells Fargo knew that it was receiving payments from investors, and that this money was then deposited into Equitybuild's Wells Fargo accounts;

(f)     Wells Fargo knew that such investor money was an investment in Equitybuild investment programs—including many that had the word "Fund" in their names, and that it was fiduciary money;

(g)     Wells Fargo knew that investor money was improperly commingled among the various Equitybuild investment programs, in accounts it held for Equitybuild;

(h)     Wells Fargo knew that investor money was being used to make Ponzi "interest" payments to existing investors;

(i)     In an effort to facilitate Equitybuild's Ponzi payments, Wells Fargo modified and/or used modified Direct Deposit Authorization Forms, which were sent to Plaintiffs and the Class, so that these forms reflected that the money being disbursed was interest on investors' investments, rather than payments to employees;

(j)     Wells Fargo thus knew that investor money from Equitybuild's accounts was improperly being disbursed to other investors as supposed interest on their investments, in Ponzi fashion;

(k)     Wells Fargo also knew that the Cohens were siphoning investor, fiduciary money intended to be invested in Equitybuild's real estate investment programs, and improperly transferring such money to their personal accounts; and

(l)     Wells Fargo also knew that the income Equitybuild was receiving from the investment programs was far less than what was disbursed to investors as supposed "interest payments," and that Equitybuild was therefore using investor funds to finance those interest payments.

175.    Defendant Wells Fargo was negligent and breached its duties to Plaintiffs and Class members who deposited their money into Wells Fargo's account(s) by:

(a)     receiving money via wire transfer from investors into Equitybuild's Wells Fargo accounts;

(b)     overseeing the commingling of these funds between and Equitybuild's Wells Fargo accounts;

(c)     improperly executing transactions to transfer investor money from the Equitybuild accounts to the Cohens' personal accounts;

(d)     modifying Direct Deposit Authorization Forms, which were sent to Plaintiffs and the Class, so that these forms reflected that the money being disbursed was interest on investors' investments, rather than payments to employees—a deviation from the standard course of business; and

(e)     transferring Ponzi scheme payments to investors via direct deposit, which investors believed to be "interest payments" owed on their investments, despite that Wells Fargo knew the properties did not generate enough income to cover the owed (and paid) interest payments.

176.    Plaintiffs and members of the Class who deposited Equitybuild funds into Wells Fargo's dedicated accounts were injured as a proximate result of Wells Fargo's negligence and seek to recover damages as a result thereof in an amount to be determined at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the Class, prays for judgment as follows:

Class Action Complaint

1           (a)      Determining that this action is a proper class action under Rule 23 of the

2  Federal Rules of Civil Procedure;

3  Awarding compensatory damages in favor of Plaintiffs and the other Class members for all

4  damages sustained as a result of Defendant's wrongdoing in an amount to be proven at trial,

5  including interest thereon;

1     (b)  Awarding Plaintiffs and the Class members their reasonable costs and

2 expenses incurred in this action, including counsel fees and expert fees; and

3     (c)  Such other and further relief as the Court may deem just and proper.

4 April 12, 2019

5             By: _/S/ Eve H. Cervantez_
               Eve H. Cervantez (164709)

6

7             Altshuler Berzon LLP
             177 Post Street, Suite 300

8             San Francisco, CA  94108
             Telephone: (415) 421-7151

9             Facsimile: (415) 362-8064
             ecervantez@altshulerberzon.com

10

11            Mark S. Goldman*
             Paul J. Scarlato*

12           GOLDMAN SCARLATO & PENNY P.C.
             8 Tower Bridge, Suite 1025

13            161 Washington Street
             Conshohocken, PA 19428

14            Telephone: (484) 342-0700
             goldman@lawgsp.com

15            scarlato@lawgsp.com

16            Alan L. Rosca*

17          GOLDMAN SCARLATO & PENNY P.C.
             23250 Chagrin Blvd., Suite 100

18            Beachwood, OH 44122
             Telephone: (484) 342-0700

19            rosca@lawgsp.com

20            Jonathan Gardner*

21            Alfred L. Fatale III*
             Ross M. Kamhi*

22            LABATON SUCHAROW LLP
             140 Broadway

23            New York, NY  10005
             Telephone: (212) 907-0700

24            Facsimile: (212) 818-0477
             jgardner@labaton.com

25            afatale@labaton.com
             rkamhi@labaton.com

26

27            *Counsel for Plaintiffs and the Class*
             (*pro hac applications to be submitted*)

28

CLASS ACTION COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury as to all matter so triable.

April 12, 2019

By: */S/ Eve H. Cervantez*
Eve H. Cervantez (164709)

Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA  94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
ecervantez@altshulerberzon.com

Mark S. Goldman*
Paul J. Scarlato*
GOLDMAN SCARLATO & PENNY P.C.
8 Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA  19428
Telephone: (484) 342-0700
goldman@lawgsp.com
scarlato@lawgsp.com

Alan L. Rosca*
GOLDMAN SCARLATO & PENNY P.C.
23250 Chagrin Blvd., Suite 100
Beachwood, OH 44122
Telephone: (484) 342-0700
rosca@lawgsp.com

Jonathan Gardner*
Alfred L. Fatale III*
Ross M. Kamhi*
LABATON SUCHAROW LLP
140 Broadway
New York, NY  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
afatale@labaton.com
rkamhi@labaton.com

*Counsel for Plaintiffs and the Class*
(**pro hac applications to be submitted*)